AF Approval _____

Chief Approval _____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 2:15-cr-141-FtM-99MRM

ROBERT FEDYNA

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by A.
Lee Bentley, III, United States Attorney for the Middle District of Florida, and
John C. Cruden, Assistant Attorney General for the Environment and Natural
Resources Division, U.S. Department of Justice, and the defendant, ROBERT
FEDYNA, and the attorney for the defendant, Robert Webb, mutually agree as
follows:

### A.    Particularized Terms

1.    Count(s) Pleading To

The defendant shall enter a plea of guilty to Counts One and Two
of the Indictment. Count One charges the defendant with Conspiracy to Commit
Wire Fraud, in violation of 18 U.S.C. § 1349. Count Two charges the defendant
with Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h).

Defendant's Initials _____

2.   Maximum Penalties

Count One carries a maximum sentence of 20 years imprisonment, a fine of $250,000, a term of supervised release of up to 3 years, and a special assessment of $100.

Count Two carries a maximum sentence of 20 years imprisonment, a fine of $500,000, or a fine of not more than twice the amount of the criminally derived property involved in the transaction, a term of supervised release of up to 3 years, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense(s), and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3.   Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First:   Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud, as charged in the Indictment; and

Second:   The defendant knew the unlawful purpose of the plan and willfully joined in it.

Defendant's Initials _____   2

The elements of wire fraud, in violation of 18 U.S.C. § 1343, are:

First: The Defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

Second: the false pretenses, representations, or promises were about a material fact;

Third: the Defendant acted with the intent to defraud; and

Fourth: the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

All in violation of 18 U.S.C. § 1349.

The elements of Count Two are:

First: That two or more persons, in some way or manner, came to a mutual understanding to violate 18 U.S.C. § 1956, as charged in the Indictment; and

Second: The defendant knew the unlawful purpose of the plan and willfully joined in it.

The elements of money laundering, in violation of 18 U.S.C.

§ 1956(a)(1)(B)(i) are:

First: The Defendant knowingly conducted or tried to conduct financial transactions;

Second: the Defendant knew that the money or property involved in the transactions were the proceeds of some kind of unlawful activity;

Third: money or property did come from an unlawful activity, specifically, wire fraud, in violation of 18 U.S.C. § 1343; and

Defendant's Initials _*Rf*_                3

Fourth:    the Defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.

All in violation of 18 U.S.C. § 1956(h).

4.   No Further Charges

If the Court accepts this Plea Agreement, the United States Attorney's Office for the Middle District of Florida and the Environment and Natural Resources Division of U.S. Department of Justice ("Environmental Crimes Section") agree not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office and the Environmental Crimes Section at the time of the execution of this Plea Agreement.

This plea agreement incorporates the attached Addendum from the United States Attorney's Office for the Eastern District of Washington.

5.   Restitution to Victim of Offense of Conviction and Other Victims

Pursuant to 18 U.S.C. 3663A(a) and (b), the defendant agrees to make full restitution to any victim of the scheme charged in Count One, to include no less than $42 million to any private victim, and no less than $4,360,724.50 to the U.S. Department of Treasury. The final amount of restitution and all specific recipients will be determined by the Court at the time of sentencing. The parties agree that the restitution order should be imposed jointly and severally with the defendant's conspirators, including at least:

Defendant's Initials _/C F_           4

- Thomas Davanzo, co-defendant in this case;

- Scott Johnson, Case Number 4:15-cr-06042-SMJ (E.D. Wa.);

- Donald Holmes, Case Number 4:15-cr-06044-SMJ (E.D. Wa.);

- Nancy Bush-Estes, Case Number 4:15-cr-6047-SMJ (E.D. Wa.); and

- Richard Estes, Case Number 4:15-cr-6048-SMJ (E.D. Wa.).

Pursuant to 18 U.S.C. §§ 3663(a)(3) and/or 3663A(a)(3), the defendant agrees to make full restitution to any victim of the Montgomery Recycling and Adirondack Biodiesel schemes, described below. The final amount of restitution and all specific recipients will be determined by the Court at the time of sentencing. The parties agree that the restitution order should be imposed jointly and severally with at least Thomas Davanzo, co-defendant in this case.

In light of the restitution obligation in this matter, the United States agrees that it will not recommend a fine. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the Plea Agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

6.    <u>Guidelines Sentence</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's

Defendant's Initials _RF_                    5

applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this Plea Agreement.  The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the Plea Agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

7.    Adjusted Offense Level - Estimate Only

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States, based on the information now available to it, estimates that the defendant's adjusted offense level is 33, as determined below:

| Guideline | Description | Levels |
|---|---|---|
| USSG §§ 2B1.1(a), 2S1.1 | Base Offense | 7 |
| USSG § 2B1.1(b)(1)(L) | Specific Offense Characteristic – Loss of more than $25,000,000 but less than $65,000,000 | 22 |
| USSG § 2B1.1(b)(10)(C) | Sophisticated means | 2 |
| USSG § 2S1.1(b)(2)(B) | Conviction under 18 U.S.C. § 1956 | 2 |
| USSG § 3B1.1(a) | Role in Offense | 3 |
| USSG § 3E1.1(a), (b) | Acceptance of Responsibility | (3) |
| Total Adjusted Offense Level | | 33 |

Defendant's Initials             6

The defendant understands that this estimate is not binding on the Court or the United States, and if not accepted by the Court, the defendant will not be allowed to withdraw from the Plea Agreement or his guilty plea. The parties agree that the United States is free to advocate for any other enhancements under the Guidelines that it deems appropriate. The parties agree that the defendant is allowed to contest the enhancement for sophisticated means and for his role in the offense. The parties further agree that the defendant is also permitted to argue for departures that he believes are appropriate and for a variance pursuant to the factors set forth in 18 U.S.C. § 3553. The parties agree that the defendant is not permitted to contest the enhancement for loss amount.

8.   <u>Acceptance of Responsibility - Three Levels</u>

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the Plea Agreement or his guilty plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of USSG § 3E1.1(a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea

Defendant's Initials _____          7

Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5 (Financial Disclosures), the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level.  The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida and the Environmental Crimes Section, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    Cooperation - Substantial Assistance to be Considered

The defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters. Such cooperation shall further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control. The defendant agrees that as part of his cooperation he shall be reasonably available for interviews that the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida,

Defendant's Initials _____        8

warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG § 5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida and the Environmental Crimes Section, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

     10.   <u>Cooperation - Responsibilities of Parties</u>

     a.   The government will make known to the Court and other relevant authorities the nature and extent of the defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the

Defendant's Initials _____        9

Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.      It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this Plea Agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)      The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this Plea Agreement, or for obstruction of justice.

(2)      The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this Plea Agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this Plea Agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being

Defendant's Initials _RF_                    10

aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by rescission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this Plea Agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3) The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this Plea Agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses. In particular, the obligations of paragraph A.4 (No Further Charges) of this Plea Agreement shall no longer apply to the United States.

(4) The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5) The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this Plea Agreement, with regard to those counts to

Defendant's Initials ___ℛf___　　　　11

which the defendant has pled; or in the alternative, at the option of the United

States, the United States may move the Court to declare this entire Plea

Agreement null and void.

11.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately

and voluntarily any and all assets and property, or portions thereof, subject to

forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and

982(a)(1), and Title 28, United States Code, Section 2461(c), whether in the

possession or control of the United States, the defendant or defendant's

nominees.  The assets to be forfeited specifically include, but are not limited to, a

$46,360,724.50 money judgment, representing the amount of proceeds obtained

as a result of the conspiracies described in Counts One and Two of the

Indictment, for which the defendant is jointly and severally liable with his co-

conspirators, as well as the assets listed below, which assets constitute or were

derived from proceeds traceable to the offenses charged in Counts One and Two

and/or were involved in the offense charged in Count Two:

        a.    Gold and Jewelry

            (1)    299 – 1 OZ Gold Canadian Maple Leaf Coins; and

            (2)    1 – 18 Karat Rolex Oyster Perpetual Day-Date II
                  Everose Watch with Diamond Rose Dial Set.

Defendant's Initials  _R_f_____          12

b.   <u>Cash and Bank Accounts</u>

Approximately $67,100.00 in U.S. Currency, seized by the United States Secret Service on or about April 15, 2015.

All funds contained in the following accounts:

(1)   Fifth Third Bank Account No. ending 1991, held in the name of Robert Fedyna, with Alberta Davies as a signatory;

(2)   Fifth Third Bank Account No. ending 9431, held in the name of Canterbury Farm, Inc., with Alberta Davies as sole signatory (The defendant admits that this account was used to conceal proceeds of the offenses to which he has pled guilty and that Davies is not a bona fide purchaser for value);

(3)   Fifth Third Bank Account No. ending 2192, held in the names of Canterbury Farm, Inc., with Alberta Davies as sole signatory (The defendant admits that this account was used to conceal proceeds of the offenses to which he has pled guilty and that Davies is not a bona fide purchaser for value); and

(4)   Fifth Third Bank Account No. ending 3318, held in the name of Alberta Davies, with Alberta Davies, Robert Fedyna, and Sofia Fedyna as signatories (The defendant admits that this account was used to conceal proceeds of the offenses to which he has pled guilty and that Davies and Sofia Fedyna are not bona fide purchasers for value.

c.   <u>Vehicles</u>

(1)   2014 BMW M6 VIN: WBSLZ9C56EDZ78493, registered to Robert Fedyna, seized by the United States Secret Service on or about April 15, 2015;

(2)   2016 Ford F450 VIN: 1FT8W4DT9GEA56772, registered to Robert Fedyna;

Defendant's Initials _____          13

(3)     2015 Porsche Cayenne, VIN:
WP1AC2A21FLA80616, registered to Alberta Davies
(The defendant admits that this vehicle was property
involved with and purchased with proceeds of the
offenses to which he has pled guilty and that Davies
is not a bona fide purchaser for value); and

(4)     2015 Range Rover, VIN: SALWR2VF5FA623201,
registered to Alberta Davies (The defendant admits
that this vehicle was property involved with and
purchased with proceeds of the offenses to which he
has pled guilty and that Davies is not a bona fide
purchaser for value).

d.     <u>Real Property</u>

The United States and the defendant agree that the
defendant will sell the following property and that the net
proceeds will be tendered to the United States Secret
Service.  Counsel for the defendant will confer with the
United States Attorney's Office for the Middle District of
Florida regarding procedure for the sale.

(1)     Real property located at 3871 Isla Del Sol Way,
described as "Lot 15, ISLA DEL SOL AT FIDDLER'S
CREEK, according to the map or plat thereof, as
recorded in Plat Book 34, Page(s) 5, 6 and 7, of the
Public Records of Collier County, Florida," registered
as owned by Robert Fedyna; and

(2)     Real property located at 1912 Center Street, Tacoma,
WA 98409, Tax ID 2855000580, described as "Lots 1
through 10, Block 10, Carroll and Hannah Addition to
Tacoma, W T, according to the plat thereof recorded
in Volume 2 of Plats, page 7, records of Pierce
County, Washington. Together with the West 20 feet
of vacated Hosmer Street abutting said Lot 1,
pursuant to the City of Tacoma Ordinance No.12553,
recorded under Recording No. 1349476, records of
Pierce County, Washington. And together with that
portions of vacated Sprague Street, pursuant to the
City of Tacoma Ordinance No. 22737, recorded under
Recording No. 8208030262, records of Pierce
County, Washington.  Situated in the County of

Defendant's Initials _____  *Rf*          14

Pierce, State of Washington (registered as owned by Centre Street Partners, LLC).

e.   Horses

The United States and the defendant agree that defendant will sell the following horses through a broker and that the net proceeds will be tendered to the United States' Secret Service.  The broker will contact the United States Attorney's Office for the Middle District of Florida to arrange details of sale.

As part of this agreement, the parties ~~agree~~ *acknowledge* that the *1869 "Doe"* ~~defendant may proceed~~ *has proceeded* with the sale of Hip # ~~2012 "Moms~~ ~~Mabley"~~ (purchased by check from Robert Fedyna for ~~$62,150.00~~ *$62,186.00* made payable to Keeneland Thoroughbred Sales Account on or about December 5, 2013) for the purpose of using the proceeds to maintain the four other horses listed below, pending their sale at an agreed upon time. ~~Prior to the sale, the defendant must obtain an appraisal of Moms Mabley from an independent third party appraiser, approved in advance by the government. The sale of the horse must be for the appraised value absent prior approval by the government. The proceeds of the sale must be deposited into a new account, used solely for this purpose and identified in advance to the government. All funds should be used only for the agreed upon purpose, and the defendant will provide the government bank statements, receipts, and other backup documentation to demonstrate that the funds were used for the agreed upon purpose. Any funds remaining in the account following the sale of the four other horses listed below will be forfeited to the government.~~

(1)   Hip # ~~1869 "Doe"~~ *2012 "Moms Mabley"* (purchased by check from Robert Fedyna for ~~$62,150.00~~ made payable to Keeneland Thoroughbred Sales Account on or about December 5, 2013);   *$50,150.00*

(2)   Hip # 242 "Starship Flare" (purchased by check from Robert Fedyna for $120,360.00 made payable to Keeneland Thoroughbred Sales Account on or about December 5, 2013);

(3)     Hip # 966 "You Go West Girl" (purchased by check from Robert Fedyna for $145,435.00 made payable to Keeneland Thoroughbred Sales Account on or about December 5, 2013); and

(4)     Hip # 1015 Moonlit Malibu" (purchased by check from Robert Fedyna for $160,480.00 made payable to Keeneland Thoroughbred Sales Account on or about December 5, 2013).

The net proceeds from the forfeiture of the assets enumerated above shall be credited towards the satisfaction of the money judgment.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also hereby agrees to waive all constitutional, statutory and procedural challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, was not addressed by the Court at the time of the guilty plea, was not announced at sentencing, or was not incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to the provisions of Rule 32.2(b)(1)(A) of the Federal Rules of Criminal Procedure, the United States and the defendant request that promptly after accepting this Plea Agreement, the Court make a determination that the government has established

Defendant's Initials             16

the requisite nexus between the property subject to forfeiture and the offenses to which defendant is pleading guilty and enter a preliminary order of forfeiture. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36. Furthermore, pursuant to the provisions of Rule 32.2.(b)(1), the United States and the defendant request that promptly after accepting this Plea Agreement, the Court make a determination that the government has established the amount of the proceeds of Counts One and Two is $46,360,724.50, and enter an order of forfeiture.

The defendant agrees that the United States shall, at its option, be entitled to the forfeiture of any property (substitute assets) of the defendant up to the value of the money judgment. In addition, the defendant agrees that the United States is not limited to forfeiture of the property specifically identified for forfeiture in this Plea Agreement. If the United States determines that specific property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the

Defendant's Initials _____ *RF*        17

defendant up to the value of any property described above.  The Court shall retain jurisdiction to settle any disputes arising from application of this clause. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture (including substitute assets) and to transfer custody of such property to the United States before the defendant's sentencing.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.  The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and U.S.S.G. § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of his cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about

Defendant's Initials _____        18

forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

12.    Income Tax Information

The defendant agrees to participate in preparing a statement with the IRS, U.S. Attorney's Office, or any other law enforcement agency setting forth the defendant's income from his participation in the charged fraud scheme.  The defendant further agrees to report said income on the defendant's tax return or amended tax return.

B.    Standard Terms and Conditions

1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses

Defendant's Initials  _RF_          19

described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this Plea Agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $200.00, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing.

The defendant understands that this Plea Agreement imposes no limitation as to fine.

2.   Supervised Release

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the

Defendant's Initials _R.F_          20

conditions of release, the defendant would be subject to a further term of imprisonment.

    3.    <u>Immigration Consequences of Pleading Guilty</u>

       The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

    4.    <u>Sentencing Information</u>

       The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

    5.    <u>Financial Disclosures</u>

       Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this Plea Agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his

Defendant's Initials _____         21

financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party.  The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years.  The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.  The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

   6.   Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this Plea Agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant

Defendant's Initials  _RF_                    22

understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. The defendant further understands and acknowledges that any discussions between the defendant or the defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this Plea Agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the

Defendant's Initials  _RF_            23

government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

     8.    <u>Middle District of Florida  and Environmental Crimes Section Agreement</u>

     It is further understood that this Plea Agreement is limited to the Office of the United States Attorney for the Middle District of Florida and the Environmental Crimes Section and cannot bind other federal, state, or local prosecuting authorities, although these offices will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

     9.    <u>Filing of Agreement</u>

     This Plea Agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

     10.    <u>Voluntariness</u>

     The defendant acknowledges that defendant is entering into this Plea Agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is

Defendant's Initials       24

pleading guilty and the elements thereof, including the penalties provided by law,

and defendant's complete satisfaction with the representation and advice

received from defendant's undersigned counsel (if any).  The defendant also

understands that defendant has the right to plead not guilty or to persist in that

plea if it has already been made, and that defendant has the right to be tried by a

jury with the assistance of counsel, the right to confront and cross-examine the

witnesses against defendant, the right against compulsory self-incrimination, and

the right to compulsory process for the attendance of witnesses to testify in

defendant's defense; but, by pleading guilty, defendant waives or gives up those

rights and there will be no trial.  The defendant further understands that if

defendant pleads guilty, the Court may ask defendant questions about the

offense or offenses to which defendant pleaded, and if defendant answers those

questions under oath, on the record, and in the presence of counsel (if any),

defendant's answers may later be used against defendant in a prosecution for

perjury or false statement.  The defendant also understands that defendant will

be adjudicated guilty of the offenses to which defendant has pleaded and, if any

of such offenses are felonies, may thereby be deprived of certain rights, such as

the right to vote, to hold public office, to serve on a jury, or to have possession of

firearms.

11.   <u>Factual Basis</u>

The defendant is pleading guilty because defendant is in fact guilty.

The defendant certifies that defendant does hereby admit that the facts set forth

Defendant's Initials  _RF_                25

below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

## FACTS

a.  Summary of Offense Conduct

The Environmental Protection Agency (EPA) has implemented regulations intended to induce traditional petroleum producers to use renewable fuels in their products. These regulations require that the petroleum producers be responsible each year for the creation of a required number of gallons of renewable fuels. One way a petroleum producer can meet this requirement is to purchase "Renewable Identification Numbers" or "RINs" from renewable fuel producers.

During much of 2013, multiple entities and individuals, including defendant Robert Fedyna and his co-defendant, Thomas Davanzo, conspired to take advantage of the RINs system by fraudulently producing and selling RINs. The conspirators then laundered the proceeds received from those fraudulent sales and tax credits through a vast network of bank accounts opened in the names of shell entities. The distribution of the proceeds of the scheme continued into 2014.

b.  Statutes and Regulations Related to Renewable Fuels

The Energy Policy Act of 2005 established the United States' first renewable (non-fossil) fuel standard, which mandated that gasoline and diesel fuel producers and importers introduce a certain number of gallons of renewable fuel into the national fuel mix over the following years. The Energy

Defendant's Initials __/{f__                          26

Independence and Security Act of 2007 established a new expanded renewable fuels mandate, known as "RFS2," which established benchmarks for the annual use of renewable fuels through the year 2022. The mandate applies to all transportation fuel used in the United States.

Under RFS2, renewable fuels are fuels produced from renewable biomass, (definition of "renewable fuel" at Title 40 of the Code of Federal Regulations (CFR), Section 80.1401), that also meet other regulatory requirements, including those set out at Table 1 of 40 CFR § 80.1426. Such fuels include corn-based ethanol, biodiesel, and "advanced biofuel."[1] Feedstock is the basic material used in the production of any renewable fuel or biofuel. Typical feedstocks in renewable fuels production include soybean oil, yellow grease, and used cooking oil.

Producers and importers of gasoline and diesel fuel are known as obligated parties. These parties have a renewable volume obligation ("RVO") that represents an amount of renewable fuel that the obligated parties are required to introduce into the non-renewable (fossil) fuel supply each year. The RVO for an obligated party is based on the party's annual production and/or imports of gasoline and diesel fuel. Each year, obligated parties must calculate their RVOs, which they then fulfill by producing (or importing) qualifying biofuels or by obtaining tradable credits based on qualifying biofuels that others produce

---

[1] Advanced biofuel means renewable fuel, other than ethanol derived from cornstarch, which has lifecycle greenhouse gas emissions that are at least 50 percent less than baseline lifecycle greenhouse gas emissions. *See* 40 CFR § 80.1401.

Defendant's Initials ___*R̸F̸*___          27

(or import), as discussed below.  Obligated parties must demonstrate their
compliance with their RVO or they may incur civil penalties.

The RINs referenced above are tradeable credits that EPA created
through regulations promulgated under the Energy Independence and Security
Act of 2007. They are designed to promote and track renewable fuel production.
The system requires that obligated parties annually retire a designated number of
RINs to meet their RVOs.  Obligated parties obtain those RINs (1) by producing
renewable fuel themselves (which generates RINs); (2) by importing renewable
fuel produced by approved foreign producers (which generates RINs); (3) by
purchasing renewable fuel (with associated RINs) from approved domestic
producers; or (4) by purchasing RINs separated from the underlying renewable
fuel; the fuel itself having been sold separately to another party for certain
designated uses.  Depending on the type of renewable fuel produced, each
gallon of renewable fuel is assigned an equivalence value by the producer or
importer.  This value is a number that is used to determine how many RINs can
be generated for one gallon of renewable fuel produced or imported according to
federal regulations.  For the renewable fuel at issue in this case, the equivalence
value was approximately 1.7 RINs.

The annual RIN retirement obligation caused a market to develop for
RINs.  Brokers exist to buy and sell RINs on behalf of renewable fuel producers
and obligated parties.  RINs can remain "assigned" to renewable fuel when
ownership of that fuel changes, but RINs can also be "separated" from the

Defendant's Initials __*Rf*__          28

renewable fuel under certain circumstances. For instance, once the renewable fuel is legally blended into fossil-based motor vehicle fuel, and designated for such a use, the RIN can be separated from the fuel that led to its generation. Then, the "separated" RIN can be traded, held for future compliance, or retired to satisfy an obligated party's RVO independent of the underlying fuel.

EPA RFS2 regulations require that all RINs generated after July 1, 2010, be transferred only through the EPA Moderated Transaction System (EMTS), an internet-accessible transaction platform used by regulated parties to generate, separate, sell, and retire RINs. *See* 40 CFR §80.1452. All EMTS activity is conducted through a Central Data Exchange (CDX) account that requires users to create an individual user identity. In order to submit data electronically through the EMTS, the data exchange requires the use of a computer and internet access.

For example, a renewable fuel producer could log on, electronically register a volume of renewable fuel produced, and declare the number of RINs that are generated for and assigned to that volume. After a buyer and seller reach an agreement to trade RINs, the seller posts the sale of the RINs on the EMTS at a certain price. The buyer logs into EMTS, verifies that the information matches the deal the buyer made with the seller, and then accepts the transaction. Upon acceptance, the RINs are transferred from the seller's RIN account to the buyer's. The EPA does not guarantee the validity of RINs, nor is money for RINs transferred through any EPA system. Nevertheless, under

Defendant's Initials _____*llf*_____                29

RFS2, no RIN transfer occurs without the transaction being recorded in the EPA's internet-based transaction platform.

During all times material herein, it was illegal to introduce into commerce any RINS generated on renewable fuel produced from a feedstock or through a process that was not described in the person's registration information. *See* 40 CFR § 80.1460(b)(5). The definition of a RIN specifies that it is "a unique number generated to represent a volume of renewable fuel . . . ." 40 CFR § 80.1401. Since each RIN is unique to a volume of renewable fuel, it is illegal to generate RINs on volumes of fuel for which RINs have already been generated. *See* 40 CFR § 80.1460(b)(6).

The Energy Independence and Security Act of 2007 also created tax credits associated with the production of various renewable fuels. One of these credits, the Alternative Fuel Credit, 26 U.S.C. § 6426(d), entitles registered claimants to a 50 cent refundable tax credit for every gallon of renewable fuel sold for use in a motor vehicle or motorboat, provided they comply with additional regulatory requirements.

      c.    Unlawful Conduct of Relevant Individuals and Entities

Defendant Fedyna was a resident of Naples, Florida, in the Middle District of Florida, among other locations. From approximately March 2013 through approximately May 2014, two companies, Gen-X Energy Group, Inc. and Southern Resources & Commodities, LLC ("SRC"), with the knowledge and

Defendant's Initials         30

assistance of Fedyna and other conspirators, purported to produce renewable

fuel and generate RINs, but in fact did not produce renewable fuel in accordance

with the applicable federal regulations and did not generate legitimate RINs.[2]

Gen-X was headquartered in Pasco, Washington, and operated a

renewable fuel production facility in Moses Lake, Washington.  Gen-X also

maintained a renewable fuel facility through its subsidiary, SRC, which was

located in Dublin, Georgia.  Throughout this period, Gen-X falsely claimed the

production of renewable fuel at its facilities and fraudulently generated RINs

---

[2]This was not the first fraudulent scheme involving RINs that was carried out by Fedyna and other conspirators. Between in or around April 2011 and in or around December 2011, and prior to the scheme involving GEN-X, Fedyna agreed with others to participate in a scheme to falsely claim the production of biodiesel at Montgomery Recycling Corporation ("Montgomery Recycling"), in Belleville, New Jersey. As part of the scheme, conspirators would purchase large amounts of petroleum diesel that they would then falsely re-label as renewable fuel, and for which they would falsely generate corresponding RINs. These RINs were generated by an employee of Washakie Renewable Energy, LLC ("Washakie"), acting as an agent of Montgomery Recycling. Throughout this period, approximately 12.5 million fraudulently generated RINs were sold to brokers and obligated parties for approximately $15.1 million. Washakie claimed and received approximately $7.5 million in biodiesel mixture fuel tax credits from the IRS based on false reports of biodiesel production at Montgomery Recycling.

Furthermore, between in or around February 2013 and in or around October 2013, Fedyna agreed to participate in a scheme to falsely claim the production of biodiesel at Adirondack Biodiesel, in St. Johnsville, New York. The government's evidence indicates that RINs were fraudulently generated by an employee of Washakie, acting as an agent of Adirondack Biodiesel. Throughout this period, approximately 100,000 fraudulently generated RINs were sold to obligated parties for approximately $440,000. In addition, approximately 1.7 million fraudulent RINs are currently owned by Washakie and were purchased from Adirondack Biodiesel for approximately $1.2 million.

The parties agree that the above-described losses should not be included as relevant conduct with regard to the charged offenses.

Defendant's Initials __*RF*__                    31

through the online EMTS system. In addition, Gen-X filed false tax refund claims with the IRS, specifically "Claims for Refunds of Excise Taxes."

Much of the renewable fuel claimed to be produced at the Gen-X facilities was re-processed through the facilities multiple times.  To carry out the scheme, Gen-X procured "feedstock" for renewable fuel from other conspirators who bought Gen-X's renewable fuel "product" and sold that "product" back to Gen-X and SRC as "feedstock."  In reality, Gen-X did not procure legitimate feedstock and did not create a legitimate renewable fuel product.  Thus, rather than generating new gallons of renewable fuel with each batch of feedstock, the same product was re-circulated through the Gen-X facilities.

The resulting RINs generated on this fuel were fraudulent and were fraudulently sold in an effort to obtain proceeds to which Gen-X and the conspirators, including Fedyna, were not entitled, as they well knew.  Further, tax refund claims for the purported renewable fuel were fraudulent as they were for renewable fuel that was either not produced at all or had been re-processed multiple times.

In furtherance of the fraudulent scheme, the conspirators used and caused others to use interstate wire communications.  For example, prior to selling the "fuel" to customers, the conspirators caused Gen-X and SRC to make electronic submissions to the EMTS system to generate the fraudulent RINs. These RINs were then sold to a third-party broker, who wired money to Gen-X and SRC to purchase the fraudulent RINs.  Gen-X and SRC held "placement"

Defendant's Initials _____  32

bank accounts that were used to receive all payments from the sale of RINs and from the United States Government based on claimed tax credits.

As part of his role in the conspiracy, Fedyna created, caused to be created and controlled shell companies to perpetuate the RINs wire fraud scheme and conceal its proceeds. The shell companies created by Fedyna and his co-conspirators acted as the sellers of "feedstock" and the buyers of renewable fuel "product" in the circular scheme. Furthermore, to execute the wire fraud and money laundering conspiracies, the shell companies created "layering accounts." Fedyna knew that the funds cycled through these shell companies' bank accounts represented the proceeds of wire fraud and the submission of false claims to the government.

The shell companies and their corresponding accounts were controlled by various individuals, all with links to Fedyna, his co-defendant, Thomas Davanzo, and/or their co-conspirators. Davanzo and Fedyna instructed these individuals to open bank accounts in the names of shell entities, directed the flow and distribution of funds obtained from the fraud, and directed and participated in the generation of false paperwork designed to create a façade that the RINs created and claimed by the conspirators were legitimate. The paperwork included false invoices from Gen-X or SRC to shell entities, which purported to show sales of renewable fuel; false invoices from shell entities to Gen-X and SRC, which purported to show the purchase of feedstock needed for the production of

Defendant's Initials ___*ll*___          33

renewable fuel; and false bills of lading, which purported to show the transportation of renewable fuel and feedstock by tanker trucks.

One of the shell companies involved in the scheme was called Southwestern Renewable Biofuels, LLC ("Southwestern Renewable"). Southwestern Renewable was a Florida limited liability company created by Davanzo, who was its Managing Member and Registered Agent, and Fedyna, who was its Manager. Davanzo and Fedyna were the signatories on at least two known bank accounts belonging to Southwestern Renewable. Davanzo and Fedyna funded Southwestern Renewable with fraud proceeds from the bank accounts of other shell companies that they controlled.

Another of the shell companies involved in the scheme was called Columbia Industrial Group, Inc. ("CIG"). CIG was a Florida company created by Fedyna, who was its President and the signatory on at least one of its known bank accounts. The company held itself out to be a "grease broker" that sold feedstock to SRC. In reality, CIG was a shell company that laundered fraud proceeds and cycled the proceeds through other accounts controlled by Fedyna and Davanzo. Fedyna and Davanzo also withdrew fraud proceeds from the CIG account for their personal use.

None of the shell companies created by Fedyna and none of the shell companies created by Fedyna's co-conspirators in connection with the fraud scheme engaged in any legitimate business with Gen-X, SRC, or the other shell companies. The fraud proceeds that the conspirators caused to be cycled

Defendant's Initials _____       34

through the placement and layering accounts were paid to Gen-X, SRC and other conspirators; some of the funds were retained for the benefit of Fedyna.

From approximately March of 2013 to approximately May of 2014, the conspirators fraudulently generated at least 60 million RINs that were based on renewable fuel that was either never produced or was merely re-processed at the Gen-X facilities. From approximately March of 2013 to approximately May of 2014, Gen-X received at least $42 million for the sale of fraudulent RINs. Further, Gen-X applied to the IRS for the Alternative Fuel Tax Credit for 8,721,449 gallons of renewable fuel that was never actually produced and thus never actually sold. As a result of the false claims, the IRS paid Gen-X approximately $4,360,724.50, to which Gen-X had no valid claim. The parties agree for purposes of sentencing that the loss amount is approximately $46 million, i.e., the total of the proceeds from the sale of fraudulent RINs and the fraudulently-obtained tax credits.

These fraud proceeds were then deposited into and laundered through accounts owned and controlled by Fedyna and other conspirators and, at times, into accounts held in the names of Fedyna's family members and/or held in the name of Canterbury Farm, Inc., which was an entity controlled by Fedyna and his wife, Alberta Davies. These accounts are listed above in paragraph A.11.b (Forfeiture of Assets – Bank Accounts). The funds in the above-listed accounts were accounts into which fraud proceeds were deposited and accounts that were involved in the money laundering conspiracy.

Defendant's Initials __*llf*__          35

At times, Fedyna and the conspirators held properties individually or jointly using their real names; at other times, Fedyna held properties in his own name individually or jointly with one or more of his family members or in the name of Canterbury Farm, Inc.; and, at other times, Fedyna and the conspirators created shell corporations to serve as accountholders or the registered owners of real and personal properties, including, but not limited to, the shell companies described above, as well as Centre Street Partners, LLC.  All properties and funds described in paragraph A.11 held by these individuals and companies constituted or were derived from proceeds traceable to the conspiracy and/or were property involved in the money laundering conspiracy.

Fedyna used proceeds generated by the fraud conspiracy described in Count One of the Indictment, and conducted financial transactions knowing that such transactions involved proceeds of wire fraud and that the transactions were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds, as described in Count Two of the Indictment, to purchase jewelry, gold coins, vehicles, horses, and various real properties, among other things.  In particular, using fraud proceeds generated by the wire fraud conspiracy and involved in the money laundering conspiracy, the defendant purchased, or acquired an interest in, the real properties and personal properties enumerated above in paragraph A.11.

Defendant's Initials __*RF*__                     36

12.   <u>Entire Agreement</u>

This Plea Agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials                           37

13.   Certification

By their signatures to this Plea Agreement, the defendant and defendant's counsel certify that this Plea Agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ___1st___ day of ___June___ 2016.

Robert Fedyna
Defendant

Robert C. Webb
Attorney for Defendant

A. LEE BENTLEY, III
United States Attorney

Sara C. Sweeney
Assistant United States Attorney

Megan K. Kistler
Assistant United States Attorney

Robert A. Mosakowski
Assistant United States Attorney
Chief, Economic Crimes Section

John C. Cruden
Assistant Attorney General
Environment & Natural
Resources Division
U.S. Department of Justice

Adam C. Cullman
Trial Attorney
Environment & Natural
Resources Division
U.S. Department of Justice

13.   Certification

By their signatures to this Plea Agreement, the defendant and

defendant's counsel certify that this Plea Agreement has been read in its entirety

by (or has been read to) the defendant and that defendant fully understands its

terms.

DATED this 26 day of MAY 2016.

A. LEE BENTLEY, III
United States Attorney

Robert Fedyna
Defendant

Sara C. Sweeney
Assistant United States Attorney

Robert C. Webb
Attorney for Defendant

Megan K. Kistler
Assistant United States Attorney

Robert A. Mosakowski
Assistant United States Attorney
Chief, Economic Crimes Section

John C. Cruden
Assistant Attorney General
Environment & Natural
Resources Division
U.S. Department of Justice

Adam C. Cullman
Trial Attorney
Environment & Natural
Resources Division
U.S. Department of Justice



**U. S. Department of Justice**

*United States Attorney*

*Eastern District of Washington*

*Suite 340 Thomas S. Foley U. S. Courthouse  (509) 353-2767*
*P. O. Box 1494                          Fax  (509) 353-2766*
*Spokane, Washington 99210-1494*

May 4, 2016

Re:    Addendum to the Plea Agreement in United States v. Robert Fedyna

If the Court accepts the plea agreement to which this addendum is attached, the United States Attorney's Office for the Eastern District of Washington agrees not to charge defendant Robert Fedyna with committing any federal criminal offenses known to the United States Attorney's Office for the Eastern District of Washington at the time of the execution of this agreement related to the conduct giving rise to this plea agreement. It is further understood that this agreement is limited to the Office of the United States Attorney for the Eastern District of Washington and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

Very truly yours,

MICHAEL C. ORMSBY
United States Attorney

s/Scott T. Jones
Scott T. Jones
Assistant United States Attorney